AUTO VACUUM FREEZER CO., Inc., v. WILLIAM A. SEXTON CO., Inc.

(District Court, S. D. New York. March 15, 1918.)

1. PATENTS ⊙240—INFRINGEMENT—IMPROVEMENT.

Though an infringer of a patented device made improvements which did not go to the heart of the invention, he cannot defeat a recovery, and doubts, if any, should be resolved in favor of the owner of the patent and against the infringer.

2. PATENTS ⊙319(1)—INFRINGEMENT SUIT—DAMAGES—EVIDENCE.

In a suit for patent infringement, held, that an award in favor of plaintiff, the owner of the patent, based on a computation of plaintiff's overhead charges, which restricted the amount paid for advertising to the normal amount, was proper.

3. PATENTS ⊙319(1)—INFRINGEMENT—ROYALTY.

Though infringing articles were sold for export, yet, where the sale occurred in the United States, the owner of a patent which was infringed is entitled to a reasonable royalty.

4. PATENTS ⊙319(1)—INFRINGEMENT—EVIDENCE.

In a suit for infringement of a patent for an ice cream freezer, held that, under the evidence, plaintiff was entitled to recover $2,151.45 as reasonable royalties on infringing freezers sold for export.

5. PATENTS ⊙319(1)—DAMAGES—INFRINGEMENT.

In a suit for patent infringement, plaintiff cannot recover on account of increased advertising claimed to have been necessitated by reason of defendant's infringement, where it increased plaintiff's business, unless there be some fundamental data on which the damage could be computed.

6. PATENTS ⊙319(3)—INFRINGEMENT—INCREASE OF DAMAGES.

In a suit for patent infringement, where defendant knew of the existence of the patent, and the infringement was deliberate, and was coupled with misrepresentations as to defendant's ownership of a fundamental patent for the infringing device, damages may be increased, in the discretion of the court, under Rev. St. § 4921 (Comp. St. 1916, § 9467).

7. PATENTS ⊙319(4)—INFRINGEMENT—DAMAGES.

In a suit for patent infringement, where there was a recovery of damages, interest will run on the amount awarded by the master from the date of his report; but interest on the remainder of the damages, increased by the court, under Rev. St. § 4921 (Comp. St. 1916, § 9467), will run only from the date of the filing of the decree.

In Equity. Bill by the Auto Vacuum Freezer Company, Incorporated, against William A. Sexton Company, Incorporated. Hearing on report of master. Decree for complainant.

See, also, 239 Fed. 898, 153 C. C. A. 26.

The report of Master William Parkin to the judges of the United States District Court for the Southern District of New York is as follows:

It having been referred to me by interlocutory decree made herein on December 14. 1916. to ascertain, take, and state the number of ice cream freezers made, the number used, and the number sold by the defendant in infringement of the third and fifth claims of the letters patent No. 1,013,672, and also the gains, profits, savings, and advantages made and derived by the defendant from and through said infringement, and also to ascertain and assess the damages sustained by said plaintiff by reason of said infringement since January 2, 1912, I, William Parkin, the special master appointed by said decree, do report that I have been attended by counsel for the re-

spective parties and have taken their proofs, which are submitted herewith. Thereon I find as follows:

The invention in question is an ice cream freezer, cylindrical in shape, having three compartments with a common axis; the outer one being an air space hermetically closed at both ends. The middle one is intended for the freezing mixture. It is closed at one end and open at the other, having a cap by which the opening can be securely closed to prevent the escape of water. The inner chamber is also closed at one end and open at the other; the open end being the one opposite to the opening of the middle compartment. This inner compartment is for the mixture to be frozen, and also has a cap by which it can be securely closed.

The freezer was first made by a company located at Omaha, but in April, 1915, the plaintiff was incorporated in New York; the former metropolitan agent of the Omaha Company, A. C. Clifford, becoming the plaintiff's president. In 1915 Robert A. Sexton, the defendant's president, was manager of the Country Life Permanent Exhibition, a concern having a permanent exhibition of household articles in the Grand Central Terminal in New York City. The plaintiff's freezer was exhibited and sold there, but, some dispute having arisen over a bill, the plaintiff refused to supply any more orders.

The defendant was thereupon incorporated, and began selling freezers in the spring of 1915. The first sold were identically the same as the plaintiff's freezer. These are known in the record as type A. Only 193 were sold, and on notification by the plaintiff that they infringed the plaintiff's patent, and threat of suit, their sale was discontinued. The defendant then made a freezer, known in the record as type B, which is the same as the plaintiff's, except the covers to the two open compartments and the absence of a handle on the side. In the plaintiff's freezer, the cover, as described in the patent, is a screw top and has double walls. This form of cover was used in 1914, but in 1915 and 1916 the plaintiff adopted a cover fastened with a clamp, and in 1917 has used a cover with a bar across it, fastened down with a screw nut at each end. In the defendant's type B the cover is single and has a bar across it, which slips under two lugs to keep it in place. Of this freezer 22,582 were sold, according to the defendant's account, but of this number 3,000 were sold at cost to Edward P. Specht for export to and sale in Cuba, and 11,343 were sold to Vincent P. Tommins at cost, for export to and sale in Canada. Specht and Tommins were salesmen of the defendant company. These sales were made on March 14, 1917, the day before the injunction herein was served, though after the decision of the Circuit Court of Appeals (239 Fed. 898, 153 C. C. A. 26) affirming the interlocutory decree. Payment for these was made by the notes of the purchasers, and the freezers were immediately shipped to Cuba and Canada. Thereafter a new corporation was formed in New York, by the same persons who compose the defendant company, and the new company bought the freezers from Tommins and Specht and the notes were paid. This new company is now engaged in selling the freezers in Cuba and Canada. It is known as the Easy Freezer Company. These freezers aggregate 14,343, leaving 8,239 freezers of type B, which the defendant has accounted for as sold in the ordinary course of business. As those sold to Specht and Tommins were sold at the cost of manufacture, all the sales expenses and overhead charges of the defendant's business have to be borne by the receipts from the 193 of type A and the 8,239 of type B. They are insufficient for that purpose, and consequently the account shows no profits, and the plaintiff has confined its claim to damages for lost sales and extraordinary expenses and to a reasonable royalty. Accordingly, I report that there are no profits to be accounted for.

On the question of damages, the plaintiff's first claim is for the profits it would have made on the freezers sold by the defendant. Both plaintiff and defendant had the freezers manufactured for them, and largely by the same concern, so that no question arises as to the ability of the plaintiff to supply the demand. But it is defendant's contention that the plaintiff, to recover, must show, either that it was forced to lower its price, or that the infringer's competition at lower prices caused lost sales; and it claims that neither of these facts exist, but that its freezer was a better article, and by reason of this fact, and superior selling and advertising methods, it displaced plaintiff's

freezer on its merits. Assuming this to be the fact, it does not defeat the plaintiff's claim. The defendant had no right to be in the market at all with its freezer, and the question is whether, if the defendant had never offered its freezers at all, its customers would have bought the plaintiff's freezer. Clifford, the plaintiff's president, says that the business was hurt by three things—the defendant's patent claims, which will be considered later, sales on consignment, and lowering of prices. I am not satisfied that there were sales on consignment to any large extent. Greiser, the plaintiff's salesman, refers to two instances which he heard of, and Sexton says that the defendant sold goods on memo, which is practically the same thing; but these sales were small in amount, and he denies that consignment sales were the common practice.

As to the lowering of prices, Greiser is positive in his statement that dealers told him they could buy the "Easy" freezer at lower prices than the "Auto Vacuum," and Sexton says the defendant had two or three prices. The account shows that the average price received was $1.75 a freezer, against $1.92 for the plaintiff's; but this is not conclusive, because many of the sales are given at the net prices after deducting commissions. Sexton maintains that the defendant adhered to its list prices, which were the same, substantially, as the plaintiff's. The account shows some sales at lower prices, but I do not think that there was a material difference between the two. The defendant made many sales through local agents, who took the freezers at a reduced price, making a profit by selling to dealers at the list price. As they were under a guaranty to take a minimum number, they may have cut prices in order to make good the guaranty, though they were under contract not to do so. If there were a substantial lowering of prices, there would be no presumption that the plaintiff could have obtained its higher price; but as the price to the consumer was the same for both freezers, and the sales were principally to dealers and jobbers in house furnishing articles, and as the plaintiff's price left an ample margin for profit, there can be little doubt that dealers would have paid the higher price for an article for which there was so large a demand.

The defendant has endeavored to show that there were other competing freezers which the purchasers might have bought. Those referred to are the Ice-Kist, the Automatic, the Easy freezer (of a different company), and the XXth Century. None of these had the characteristic air space for insulation, and the openings at opposite ends to prevent the ice and salt from mixing with the cream. They were of a distinct type from the plaintiff's and defendant's. Nothing is said about the sales of the Ice-Kist. Sales of the Easy freezer were discontinued about 1900, and those of the XXth Century about 1907. Sales of the latter amounted altogether to about 150,000. The Automatic is the only one on the market which could have come into competition with the plaintiff's freezer. The Automatic did not have the openings at opposite ends to prevent the freezing mixture from spoiling the cream, and, while it had the double walls for insulation, the space between them was filled with an insulating material. The structure itself appears to be heavier and more cumbersome than the plaintiff's. The sales of it were from 300 to 1,000 each year, while those of the plaintiff were about 15,000 in 1915, and over 30,000 in 1916.

The plaintiff advertised its freezer extensively, and it was known in all the territory where the defendant's sales were made. Some of the purchasers of defendant's freezer had formerly bought the plaintiff's. The fact that they bought defendant's freezer shows that they preferred that type, and, although there is some evidence that complaint was made of the screw top cover rusting, the clamp top apparently overcame this difficulty. I therefore find that, but for defendant's competition, plaintiff would have sold 8,432 freezers, which defendant sold, and would have made the same profit on them as it made on its own sales.

Coming, now, to the question of profit, Clifford says that they sold about two two-quart freezers to one one-quart freezer, and that about 10 per cent. of their sales were to consumers, 45 per cent. to dealers, and the same to jobbers. On these figures he calculated the average price as being $2.19. The proportion of two-quart to one-quart freezers is, however, wrong. In 1915 the plain-

tiff sold about 6,500 one-quart and 8,500 two-quart freezers; the one-quart freezers being about 37 per cent. of the total and the two-quart freezers about 63 per cent. In 1916 there were sold 12,598 one-quart freezers and 20,415 two-quart freezers; the one-quart being 38 per cent. of the total and the two-quart 62 per cent. The sales, therefore, were about three two-quart to two one-quart freezers. The defendant's sales, exclusive of those to Tommins and Specht, were about in the same proportion. According to the list prices, with the percentages given above for the sales to consumers, dealers, and jobbers, the average price would be $2.14. But, dividing the total sales into the total receipts, the average price actually received was $1.92. If the difference were due to a lowering of prices to meet the defendant's competition, this would be a factor to be taken into consideration; but no such claim is made, and the record contains no definite explanation of the cause of the difference.

The sales for 1916 amounted to $63,547.26, and the manufacturing cost was $34,927.42, leaving a gross profit of $28,619.94. Clifford stated that the overhead for the freezers was $16,132.86, exclusive of advertising, leaving a net profit of $13,487.08. The normal amount of advertising he places at $3,000, leaving a profit of $10,487.08 on 33,013 freezers, or a profit on each freezer of 32 cents. This is the calculation given by plaintiff's counsel in his brief. But the difficulty is with the overhead charge. The plaintiff sold, besides the freezers, a trousers presser and a coffee percolator. The total sales for 1916 of all three articles were $87,864.11, and the total overhead was $32,088.63. Clifford, in estimating the profit, said that the total overhead was 30 per cent. of the gross sales, and that he might properly have charged 15 per cent. to the freezers and 15 per cent. to other articles, but that for safety he put the overhead on the freezers at 20 per cent. of the sales. Clearly he was confused in doing so. As the plaintiff did not manufacture any of the articles, if the overhead were apportioned among them in proportion to the sales, the overhead for each article would be 30 per cent. of the gross sales of that article. But the percentage is wrong. The total overhead is 36½ per cent. of the gross sales.

Clifford has given an itemized statement of the figures which comprise the total overhead, and of those which are applicable to the freezers. They are as follows:

|  | Total Overhead. | Freezer Overhead. |
|---|---|---|
| Interest, discount and collections | $ 1,871.22 | $ 1,347.28 |
| Office rent | 1,402.50 | 584.17 |
| Office salaries | 8,176.69 | 3,096.45 |
| Total shipping expenses | 7,030.81 | 3,078.76 |
| Traveling | 2,017.52 | 949.59 |
| Insurance | 97.93 | 44.88 |
| Commissions | 5,143.31 | 3,521.93 |
| General | 6,348.65 | 2,909.80 |
|  | $32,088.63 | $15,532.86 |

In the record the total overhead for the freezers is stated to be $16,132.86, but the items as given only total $15,532.86.

Defendant's counsel claims that the overhead charge cannot be right; that the sales of the freezers were 72 per cent. of the total sales, while the overhead charged to the freezers is less than half; and he points out that certain of the items appear unduly small as compared with the estimates given by Clifford in his testimony. These estimates were given on Clifford's direct examination. He was not speaking from the books, but from his general knowledge of the business. He was asked on cross-examination to produce from the books a statement of the total overhead. This he did at the next hearing, and gave the items above set forth. On redirect he gave the items of overhead applicable to the freezers as furnished to him by the accounting department from the plaintiff's books. This was received without objection or criticism on the defendant's part. Most of the items are for disbursements, which must have been made specifically for the freezers and would be charged to them in the books; and these items, it seems to me, must be accepted as correct. The office rent, office salaries, and general expenses could not be so

charged, but should be apportioned according to the sales, and 72 per cent. charged to the freezers. This would make the overhead $20,410.48, exclusive of advertising expenses. The plaintiff spent in 1916 $27,112.90 for advertising the freezer, and the defendant claims that this should be included as one of the overhead charges. The normal annual advertising which a concern does to keep its wares before the public is a proper overhead charge; but this was an extraordinary expense, incurred to meet the defendant's illegal competition. It should not all be charged in the overhead. In 1915 the plaintiff spent $750 in advertising, and in 1916, before type B appeared, Clifford appropriated $3,000 for advertising. This same amount has been spent in 1917, and it should be taken as the normal figure. Adding this to the overhead makes a total of $23,410.48, which, deducted from the gross profit of $28,619.94, leaves a net profit of $5,209.46, or 15¾ cents a freezer.

Of the 8,432 freezers, 50 are put down as donations, samples, etc. Defendant contends that these should not be included in the sales; but, as defendant has stated in the account that it received $92 for them, or $1.84 apiece, they must be considered as sales. I, therefore, find that the plaintiff is entitled to recover 15¾ cents a freezer on 8,432 freezers. The amount is $1,328.04. As the sale of 14,343 freezers to Tommins and Specht was made in New York, the plaintiff is entitled to a reasonable royalty on these freezers, under the decision in Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398.

What is a reasonable royalty in any given case is a business question. It becomes one of the expenses of manufacture and sale, and the question is: How much can one who wishes to manufacture and sell under the patent afford to pay for a license? Consolidated Rubber Tire Co. v. Diamond Co. (D. C.) 226 Fed. 455. This must depend upon the amount of profit he can make. In U. S. Frumentum Co. v. Lauhoff, 216 Fed. 610, 132 C. C. A. 614, it was said that it might "be shown what plaintiff's patent property was, to what extent defendant had taken it, its usefulness and commercial value, as shown by its advantages over other things, and by the extent of its use, and as shown by the profits and savings which could be made upon its sale or adoption. * * * Experts may be amply qualified to give useful opinions as to the value of the property which is to be appraised."

Plaintiff's witnesses as to the royalty were Clifford and White; the latter being the treasurer of the plaintiff company and the capitalist backing it. Both had actual knowledge of the business, and the utility and advantages of the patent. Clifford gave 72 cents as the average profit on a freezer, and said that in his opinion one-half the net profit, or 36 cents, would be a reasonable royalty. This figure was given as his estimate of what the profit actually was, and not of what it should be. As already shown, it was far from the fact. White gave as his estimate of the proper royalty 25 per cent. of the wholesale price. He based this on a large experience in royalties on copyrighted books. It may be doubted if there is a close enough analogy between copyrights and patents to make his experience of value. He and Clifford both referred, also, to their experience with the patent on their trouser presser, for which a royalty of about 16 per cent. of the selling price was paid. It seems to have been paid, however, only while the article was being tried out and its value ascertained. They ultimately bought it, and the payment royalties ceased. The defendant's witnesses were Treman and Cordley, both officers of corporations which dealt in household furnishing articles. The former sold the Automatic freezer, on which he had paid a royalty for a few years, beginning in 1886, under a German patent, merely as a moral obligation. The royalties appear to have averaged about 65 cents a freezer, or about 15 per cent. of the retail price. He said that a fair royalty, for an article selling at retail for $2 to $3, would be 5 or 10 cents. Cordley's company sold the earlier Easy freezer, and later the XXth Century. He gave 5 per cent. to 10 per cent. of the selling price as a reasonable royalty.

It is not thought that any of this testimony comes within the class of expert evidence which is said to be admissible in the Frumentum Case above cited. The royalty paid on one patent can hardly be evidence of what should be paid on another, unless the articles are alike, and the conditions of manu-

facture, sale, demand, and price are known to be similar. In the case above cited it is said that a "reasonable royalty" is not, strictly speaking, a royalty at all, but general damages for the wrong done. In this view it may be questioned whether an opinion as to the amount of royalty to be paid is competent evidence. Treman and Cordley had never seen the plaintiff's freezer until it was shown them on the hearing, although Cordley had seen the advertisement. It does not appear that they knew anything about its utility or advantages, or the conditions of its manufacture and sale. As dealers in articles of a similar character they might have been qualified by proper study of the conditions to have given testimony of some value showing the probable cost of manufacture and sale of such articles, the proper selling and overhead expenses, the demand and profit which dealers in house-furnishing articles would expect to make, and what additional profit the possession of the monopoly might be expected to command. These are the factors on which one who was about to enter into a royalty agreement would figure, and it is thought that expert testimony should proceed along these lines. Treman's opinion was objected to, but admitted over the objection, and it should be disregarded. Cordley's was not objected to, and may be considered for what it is worth.

A profit of 15¾ cents would not leave much margin for a royalty over the business profit. If the list prices were maintained, the average price would be $2.14 a freezer. Both Clifford and Sexton evidently thought the list prices were fair and that they could be obtained. The account shows many sales made at full prices. At $2.14 the profit would be 37¾ cents a freezer, about 35 per cent. of the cost. There is no manufacturer's profit to be deducted, but a licensee would expect to make a profit on the business of selling, and to share in the advantages of the monopoly. One-half the profit (19 cents), which Clifford gives as a fair royalty, would be about 7½ per cent. of the selling price. This is the mean of Cordley's 5 to 10 per cent., and is 10 per cent. of the price actually received. I think a somewhat lower figure, or 15 cents a freezer, would be a fair royalty. 14,343 freezers, at 15 cents, would amount to $2,151.45. I find that the plaintiff is entitled to recover $2,151.45 for reasonable royalties on the 14,343 freezers sold to Tommins and Specht.

Defendant claims that the clamp top substituted in 1914 for the original screw top was an improvement and that an apportionment of profits must be made. But the top was a small part of the freezer. The dominating features were the air space and the openings at opposite ends. Both plaintiff and defendant so considered them, as shown particularly by the defendant's circular claiming to own a patent covering the process of freezing by means of a hollow air space. The clamp top was a screw top within the meaning of the McCann patent. It was a double-walled top, having across it a bar, which could be turned on its own axis like a rock shaft. The ends of the bar had eccentric cams, which went under lugs or ears on the freezer. There was a handle attached to the bar, and when this was raised, so as to revolve the bar, the eccentricity of the cams acting against the lugs pressed the top down and held it in its place. To put the top on it had to be rotated in the same way as the defendant's cover has to be rotated, a fact which has been held by Judge Hand to make the defendant's cover the equivalent of the cover of the McCann patent. Under these circumstances an apportionment is not necessary. National Folding Box Co. v. Elsas, 86 Fed. 917, 30 C. C. A. 487.

The plaintiff also claims to recover the amount expended by it in efforts to meet the defendant's competition. Both White and Clifford say that, when the defendant's type B freezer appeared, it became absolutely necessary to enter upon an extensive advertising campaign if they wished to maintain their position in the market. White says the whole character of their advertisements had to be changed. The advertisement principally complained of is a circular put out by the defendant, which states: "The U. S. patent granted in 1908, covering the process of freezing by means of a hollow wall or air space, is owned by the Wm. A. Sexton Co., Inc. Applications for patents covering every part of the construction of the 'Easy' freezer have been duly filed and all rights fully protected." This statement surrounded a medallion on which were the words "Patents Protected by the Patent Title & Protective

Co., New York." The natural inference from the statement and its collocation with the words on the medallion was that the defendant had a monopoly of the process of freezing by means of a hollow wall or air space, and that this monopoly was protected by a policy of the Patent Title & Protective Company. The defendant had no such monopoly nor any patent for such a process. The patent of 1908 which is mentioned was one granted to William A. Sexton for a soda fountain. It was for a structure, and not for a process, and although it could be and was employed for freezing and keeping ice cream, it had no relation to the freezer which the defendant was advertising and selling. The defendant did not mark its freezer as covered by this patent. The defendant had a policy issued by the Patent Title & Protective Company, but it only applied to an application which the defendant had made for a patent on its type of freezer. This patent, which was subsequently issued, while in form for a complete freezer, in effect, if of any validity, could only be for an improvement by reason of the form of cover which the defendant used. This cover has been held to be the equivalent of the plaintiff's cover, and the patent is probably invalid. This circular, therefore, was misleading. Sexton says that it was only used for a short time. It was, however, one of the things with which the plaintiff had to contend.

In the House Furnishing Review for April and May, 1916, the defendant advertised its freezer as "protected by a basic patent" and "protected in every possible way by basic patents," with the medallion above mentioned. This was before it had any patent, except the patent of 1908 for a soda fountain. The patent on the freezer was not issued until April, 1917. To meet these advertisements the plaintiff had to send out circulars and advertisements calling attention to the fact that the defendant's freezer was an infringement of its patent. Clifford says the trade was confused by the situation. Sexton condemns the plaintiff's method of advertising, because it made dealers fear the possibility of a lawsuit and prevented the plaintiff from selling its freezers. But, if so, it was the direct result of the defendant's infringement and misleading statements.

Another thing of which the plaintiff complains are circulars in which the defendant offered to protect its customers from infringement suits. This was a legitimate form of competition, if the competition itself had been legal; but it had to be met. It is for the expenses incurred in its efforts to preserve its business against such attacks that the plaintiff asks compensation. The defendant objects that these expenses are not actual damages within the meaning of the statute, and cites Clark v. Wooster, 119 U. S. 322, 7 Sup. Ct. 217, 30 L. Ed. 392. This was a case, however, where there was an established license fee, and the only damages were the loss of that fee. Actual damages are compensatory damages (Birdsall v. Coolidge, 93 U. S. 64, 23 L. Ed. 802) and the same rules apply in patent cases as in other cases of the unlawful appropriation of property (U. S. Frumentum Co. v. Lauhoff, supra). When a patentee keeps his patent a close monopoly, the damages are the same as in cases of breach of contract, not to compete. Cincinnati Gas Co. v. Western Siemens Co., 152 U. S. 200, 14 Sup. Ct. 523, 38 L. Ed. 411. And it is well settled that, where a regular and established business is wrongfully injured or destroyed, the rule for measuring the damages is to ascertain how much less valuable the business is by reason of the interruption. Yates v. Whyel Coke Co., 221 Fed. 603, 137 C. C. A. 327.

There are many cases where a jury is allowed to fix the value of a business or good will which has been injured or destroyed by some wrongful act. Wakeman v. Wheeler, 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Dart v. Laimbeer, 107 N. Y. 664, 14 N. E. 291; Stevens v. Amsinck, 149 App. Div. 220, 133 N. Y. Supp. 1145. In the Dowagiac Case, supra, the court, after mentioning loss of sales, license fees, and reasonable royalties as different measures of damages, says that there are still other grounds upon which damages may be assessed in infringement cases, as where hurtful competition is shown. Expenses incurred in preventing the consequences of an unlawful act are a well-recognized measure of compensation in the law of damages, if reasonable in amount and incurred in good faith. 1 Sedg. on Damages (9th Ed.) § 226b et seq. In such cases the amount expended is prima facie recoverable, and the burden is on the defendant to show that it is unreasonable. 1 Sedg. § 227.

Where, however, the plaintiff has derived a benefit from the expenditure he can only recover the amount of his actual damage. British W. E. & M. Co. v. Underground E. R. Co., [1912] A. C. 673.

By the extensive advertising, the sales were probably increased much beyond the normal increase which $3,000 of advertising would have brought. In 1915 only $750 was put in advertising, and 15,000 freezers were sold, for about $30,000. In 1917, after the injunction was issued, and up to July, the sales about equaled the total sales of 1916, and at the close of the season, in October, the sales amounted to about $85,000, as against $63,547.36 in 1916. Only $3,000 was spent in advertising, and the gain was about 30 per cent. Some part of this was due to the increase in the retail price of 25 cents a freezer. Taking the normal increase at 25 per cent. for an expenditure of $3,000 in advertising, it would have taken three to four years to bring the sales up from the $30,000 of 1915 to the $63,000 of 1916, in which time $12,000 would have been spent in advertising, or about $15,000 less than the actual expenditure. The plaintiff spent $10,000 to $12,000 in 1916 for display advertising and $1,743.15 for demonstration. The balance, about $15,000, was spent for circulars and trade prospectuses. I think this amount should be allowed. The evidence is meager; but, where the infringement has been deliberate, every doubt should be solved against the infringer.                    \

This was a deliberate infringement. The Court of Appeals has practically so found. Sexton knew of the plaintiff's patent when he put out his type A freezer, which was a complete copy. While he hoped by the slight change in form of type B to escape the penalties of infringement, the existence of this hope does not prevent the infringement from being deliberate. Consolidated Rubber Tire Co. v. Diamond Co., supra. The history of defendant's activities, as above set forth, shows a deliberate attempt to appropriate all the benefits of plaintiff's patent. See Burdett v. Estey (C. C.) 3 Fed. 566; Lyon v. Donaldson (C. C.) 34 Fed. 789; Weston v. Empire (C. C.) 155 Fed. 301. I therefore find that $15,000 was expended by plaintiff to protect its business from the defendant's illegal competition, and that it is entitled to recover this amount. In justice to Sexton, it should be said that he showed a readiness to give every assistance in his power to aid the master. It is difficult to reconcile his conduct of the business with his attitude on the reference.

I report that the plaintiff is entitled to recover $1,328.04 for damages from lost sales, $2,151.45 for royalties on the sales to Tommins and Specht, and $15,000 for expenses in meeting defendant's competition, making a total of $18,479.49.

Philip C. Peck, of New York City, for plaintiff.

Samuel E. Darby and Walter A. Darby, both of New York City, for defendant.

MAYER, District Judge. The clear and comprehensive report of the master renders unnecessary a duplication of the recital of all the facts. Only such facts will be referred to as are necessary to explain the questions of law discussed.

[1] 1. The master allowed plaintiff $1,328.04 as damages for loss of profits. Defendant contends that an apportionment of profits must be made, because of the Lawless patent No. 1,108,765, for cover-fastening device for receptacles. It is, of course, difficult to say to what extent, if any, customers were influenced by their purchases because of the improved top. The fundamental feature of plaintiff's invention, and of its commercial ice cream freezer, was the ability to make ice cream without the usual attendant labor, and these improvements should not, therefore, deprive plaintiff of a recovery for damages. If such were to be held, an infringer could entirely escape because a plaintiff, in selling its commercial article, had added some improvements

which did not go to the heart of the invention. In such situations the courts now resolve the doubt, if any, in favor of the owner of the patent, and against the infringer.

[2] The master charged in the overhead account only $3,000 for advertising; whereas it appeared that plaintiff had spent $27,112.90 for advertising in 1916. The testimony showed that plaintiff had expended $750 for advertising in 1915, and in 1916, before type B appeared, $3,000 had been appropriated for advertising. The master therefore regarded $3,000 as the normal expenditure, and pointed out that the sum of $27,112.90 was spent in 1916 because of the defendant's conduct, not only in infringing but in doing so by unfair methods. The conclusion of the master as to the facts is fully supported by the evidence, and there is no question that it was vital for the preservation of plaintiff's business that it should counteract the efforts and actions of defendant by an advertising campaign involving an expenditure largely in excess of what plaintiff had theretofore found necessary. In the peculiar circumstances of the case, therefore, 1 agree with the master that under this branch of the controversy it was proper to charge only $3,000 for advertising in the estimate of overhead. It seems to me that the figure of $1,328.04 is correct.

[3, 4] 2. On March 14, 1917, the day before the injunction was served, defendant sold 14,343 freezers to Specht & Tommins for export and sale in Cuba and Canada; the sale taking place in New York. Under the authority of Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398, the master concluded that plaintiff was entitled to a reasonable royalty. In this he was right. The problem, then, was to ascertain such reasonable royalty. It is almost impossible in such a case to work out a result which can be said to be mathematically accurate; but the courts recognize this difficulty, and, if proper and sufficient data are made the basis of calculation, it is appreciated that the result is the best that can be obtained. I think the master's figures are as nearly right as such figures can be, and I agree with him in the conclusion that plaintiff is entitled to recover $2,151.45 as reasonable royalties on these freezers sold to Specht and Tommins.

[5] 3. The final question is one of considerable difficulty. There is naturally a great temptation to award to a plaintiff, under the circumstances disclosed in this case, damage which may·be morally, but not legally, proved, and I am quite sympathetic with the master in his desire and effort to award to plaintiff some amount because of the increased advertising expenses for 1916. In 1915 only $750 was spent for advertising, and 15,000 freezers were sold, for about $30,000. In 1917, after the injunction was issued, and up to July, the sales of plaintiff about equaled the total sales for 1916, and at the close of the season, in October, the sales amounted to about $85,000, as against $63,547.13 in 1916. Only $3,000 was spent in advertising, and the gain was about 30 per cent. As the master points out, some part of this gain was due to the increase in the retail price of 25 cents a freezer. The master then concludes that "about" $15,000 should be recovered on this branch against defendant, and he states:

"Taking the normal increase at 25 per cent. for an expenditure of $3,000 in advertising, it would have taken three to four years to bring the sales up from the $30,000 of 1916, in which time $12,000 would have been spent in advertising, or about $15,000 less than the actual expenditure. The plaintiff spent $10,000 to $12,000 in 1916 for display advertising and $1,743.15 for demonstration. The balance, about $15,000, was spent for circulars and trade prospectuses. I think this amount should be allowed. The evidence is meager; but, where the infringement has been deliberate, every doubt should be solved against the infringer."

The difficulty with the master's reasoning is that it is founded on mere speculation. It is not possible for any one to say whether, if defendant had not infringed, it would have taken three or four years to bring the sales up from $30,000 to $63,000 on an advertising expense of $3,000, and with the added complication of an increase of the retail price. The meritorious character of the article might have increased the sales to $63,000 in less than three or four years, on the one hand, while, on the other, it might have taken longer to reach this increased figure. The result of a wide and intelligent advertising campaign may be, not merely to sell the article for the time being, but to create a knowledge concerning it, and a good will for it, which may be felt for a considerable period after the advertising has ceased or been diminished, and therefore the $27,000 spent for advertising may have been bread cast upon the waters.

There are many particulars in which the courts are satisfied with reasonable estimates and approximate calculations in ascertaining damages in infringement cases; but in every case, not only must damage be the proximate result of the tort, but there must be some fundamental data upon which it can be estimated. The best the master could do, in his effort to work out what seemed to him to be substantial justice, was to conclude that plaintiff should have a recovery on this branch to the extent of "about" $15,000. The "about" is the best argument as to the infirmity of the conclusion—a conclusion which the master frankly states is based upon evidence which "is meager." The furthest which plaintiff may hope for is the allowance of only $3,000 in the charge for overhead, as discussed supra. That advantage has already been accorded to it. To go beyond that, and hold defendant liable for an increased advertising expense, which, inter alia, has produced increased sales, is to say that damage may be awarded upon the guess of the court, rather than upon evidence.

I am of opinion, therefore, that the master erred in respect of this item, and therefore that the sum of $15,000 must be deducted from the total recommended by the master to be awarded to plaintiff. The result is that the principal amount which plaintiff is entitled to recover against defendant is $3,479.49.

[6] 4. Plaintiff has moved to increase the damages in accordance with the provisions of section 4921 of the Revised Statutes (Comp. St. 1916, § 9467). The master has held that "this was a deliberate infringement." The testimony fully sustains this conclusion. In 1915 Sexton, the defendant's president, was manager of a concern having a permanent exhibition of household articles in the Grand Central Terminal in New York City. Plaintiff's freezer was exhibited and sold

there; but, some dispute having arisen, plaintiff refused to supply any more orders. Thereupon defendant was incorporated and began selling freezers in the spring of 1915. The first, known as type A, sold were identically the same as the plaintiff's freezer, and on notification the sale was discontinued. Defendant made a freezer known as type B, which is the same as the freezer of plaintiff, except as to the covers to the two open compartments and the absence of a handle on the side. The methods adopted by defendant were very unfair and may properly be described as wanton. Defendant seeks to excuse its conduct because it had applied for a patent, which was subsequently granted, and secured a policy protecting against attacks of infringement from some concern known as the Patent Protective Company of New York. In Mowry v. Whitney, 14 Wall. at page 653, 20 L. Ed. 860, the court held:

"His infringement of the complainant's patent was not wanton. He had before him the judgment of the Patent Office that his process was not an invasion of the patent granted to the complainant, and though this does not protect him against responsibility for damages, it ought to relieve him from liability to interest on profits."

The facts in that case, however, were quite different from the facts in the case at bar and from many other cases (too numerous to cite), of which Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D. C.) 226 Fed. 455, affirmed 232 Fed. 475, 146 C. C. A. 469, is an illustration. Under all the circumstances disclosed by the evidence, the damages will be increased threefold, making a total of $10,438.47.

[7] 5. As the award is for damages, interest will run on $3,479.49 from the date of the master's report. Crosby Valve Co. v. Safety Valve Co., 141 U. S. 457, 458, 12 Sup. Ct. 49, 35 L. Ed. 809. Interest on the remainder will run only from the date of the filing of the decree to be made herein, because that amount was not found by the master, and will only be judicially determined when the decree is filed.

Plaintiff, therefore, may have a decree for $10,438.47, with interest on $3,479.49 from January 16, 1918, together with costs and disbursements.