## REMINGTON RAND, Inc., v. ART METAL CONST. CO.

District Court, W. D. New York. August 18, 1929.

Barton A. Bean, Jr., and Albert R. Henry, both of Buffalo, N. Y., for plaintiff.

Charles Neave, of New York City, and Charles W. Parker and John Lord O'Brian, both of Buffalo, N. Y., for defendant.

HAZEL, District Judge. Bill in equity for infringement by defendant, Art Metal Construction Company, of complainant's two United States letters patent No. 15,529, reissued January 16, 1923 (original application dated June 1, 1920; application for reissue February 3, 1922), to Ralph H. Dick and Carl F. Wolters, and No. 1,350,363, dated August 24, 1920 (application filed March 28, 1917), to the inventors named and Roser B. Sutter, both patents relating to different forms of insulation for lining metallic, heat-resisting cabinets or safes and method of making same. In the specification of the reissued patent it is stated:

"Our invention relates to cabinets or light weight safes intended for use as containers for valuable papers, documents, records or other articles, and our object has been to devise a construction which would combine with absence of great weight, elements to resist the entrance of heat to the interior, a strength and rigidity of construction which will prevent buckling under high temperatures or injury to the cabinet in the event of a fall or rough handling of any kind, together with marked simplicity and economy in the methods of construction employed."

The insulation lining throughout is of uniform contour, precast entirely in a single piece, of monolithic form of material mixable with water, preferably of gypsum or plaster of paris containing water which can be liberated under fire conditions. It is provided with an outer lining of light and durable sheet metal at sides, doors, top, and bottom.

The patent of earlier date describes a safe construction with walls of light weight but having strength and efficient resistance to heat entering the interior of the safe, and insulation material for heat-resisting safes or cabinets—one kind consisting of a relatively wet inner insulation substance which is placed in the construction next to the dry insulation and adjoining the inner metallic lining of the cabinet, while the dry insulation (preferably of plaster), which is of low specific gravity and heat conductivity, is put adjacent to the outer wall of the safe directly beside the wet insulating material. The specification substantially states that the inner wet insulation consists of a salt of stable character (preferably Epsom salt) having a high content of water crystallization which absorbs heat in case of fire and produces steam for wetting the contents of the cabinet.

The defenses are invalidity of both patents, noninfringement, and restriction of the claims of the reissue.

Plaintiff claims that, in the manufacture of its patented safe cabinets, which are mainly intended for keeping office records and correspondence, as distinguished from iron safes, for safekeeping money and a limited number of papers and books, of the prior art, the problem was to insure the safety of the contents of the cabinets or safes in case of fire. It is elicited that the commonly used sort of fireproof safe was fabricated of thick, heavy metal, or of cast iron, with insulated walls, containing only a comparatively small interior for keeping money and other valuables, books, and papers; that they were not designed for keeping in them large amounts of correspondence or generally matters pertaining to business records of an office, and hence the essential feature of the patents in issue was to devise an insulating material of a particular character in combination with the walls of the safe, both inner and outer, to effectively resist fire and prevent, so far as possible, the destruction of the safe contents—something the old type of safe rarely accomplished, or was unable to successfully accomplish. Systematic fire tests to attain the desired result were made by the Safe-Cabinet Company, plaintiff's predecessor, in 1912, as the evidence shows, and a new way of testing the durability of cabinet safes developed by placing them in a specially constructed furnace wherein the effect of the heat of the flames might be fairly ascertained. An experimental test was made with a safe, having inner and outer metallic walls and insulating material of cellular asbestos, in which writings and documents were inclosed, and the contents were uninjured by the flames for a period of 45 minutes. Complete satisfaction, however, did not result. The fire-resisting qualities were inadequate, and, as a possibility existed of safes falling and collapsing during a conflagration, resort was subsequently had to a drop test whereby the safe, first heated in the furnace, was allowed to fall 30 feet onto a pile of bricks. Other practical tests, bearing upon the problem confronting the inventors, followed, and in 1915 a new type of metallic cabinet safe was produced by plaintiff and Mr. Sutter, wherein the fire test disclosed protection to the contents for 90 minutes. In construction of the latter type, a composition slab material was used, similar to the material involved in Craft-Stone v. Zenitherm Co. (C. C. A.) 22 F.(2d) 401, and, though longer protection of the contents from fire ensued, it was not accepted as wholly satisfactory, owing to the smouldering of the slab material from the intensity of the heat. In 1917, the slab and cork idea was abandoned, and subsequent trials and experiments finally resulted in the inventions in suit.

The mixture of gypsum and sawdust is poured into a mold corresponding in size to the inner sides of the outer steel lining or wall, and, when set or hardened, the insulating lining (thickened at corners and edges) is removed from the mold. At this stage it contains free moisture which, if allowed to remain, might corrode the metal walls and increase the weight of the safe. Elimination of undesired free moisture is by drying in the drying room, thus removing so-called free water with the aid of a blowing device, and retaining the crystallized water, which, on occurrence of fire, becomes vaporized and moistened, thus preserving the contents of the safe. After drying the mold or cast to a predetermined point, a metallic casing around it completes the safe.

All the claims, 23 in number, except claim 15, are involved. Claim 1 describes the monolith of gypsum structure, and refers to an inner, independent integral body with fixed walls, devoid of free water, and retaining chemically bound water, and an outer metal shell, independent of the inner body, constructed to prevent escape of the released vapor, which, in case of fire, contacts, for protection, the contents of the cabinet.

Article claim 9 does not refer to the arrangement of the walls of the safe, but emphasizes the composition of which the safe lining cast is formed; while method claim 22, embodying the steps necessary to complete the structure, reads:

"The method of making fire resisting safes or linings for safes which consists of the following steps or stages: the preparation of a mixture of suitable material with water substantially as described, the preparation of a suitable mold having mounted therein a network of reinforcing material, then pouring the fluid mixture into the mold so that the reinforcing material will be incorporated in the cast, and subjecting the cast to a drying process to an extent sufficient to eliminate from the cast the free water contained therein, and yet not sufficient to release the moisture which is chemically bound with the material of which the cast is formed."

The specification of patent No. 1,350,363 states:

"The inner wetting insulation may consist of a material with a vast number of minute air cells in which is stored by immersion, a salt of stable character having a high content of water of crystallization, which is a permanent and ever ready heat absorber and steam producer. This serves when subjected to high temperatures as a heat consumer and also as a means of wetting down the contents of the safe or cabinet."

The use of concrete, plaster, and the like is disclaimed because of their heft and bulkiness. The essential purpose of the patentees resides in placing a dry insulating substance between the wet insulation and the metallic outer lining. The characteristic of the composition for insulation is plainly set forth in the specification, and reference has already been made thereto. The patent has three claims. It will suffice to reproduce claim 3:

"3. A fire-heat resisting document-preserving cabinet constructed with an inner sheet metal wall and an outer sheet metal wall and having a wetting insulation disposed outside said inner metallic wall and comprising material which under heat gives off steam and operates by liquefaction and vaporization to retard the entrance of heat to the interior of the safe and to moisten the contents thereof, and a relatively dry insulation disposed between said outer sheet metal wall and said wetting insulation and operative to protect said wetting insulation against premature or excessive vaporization, the inner wall permitting the passage of the generated steam to the interior of the cabinet."

The defenses of anticipation and invalidity of both patents in controversy necessitates examination of prior art structures. Concededly, in prior art safes, it was a well-known expedient to use various kinds of insulating mixtures for linings placed adjacent to the metallic outer shell. Indeed, long ago it was recognized that a useful filler must have certain distinctive traits to withstand the inroads of fire in order to overcome destruction of the safe. It was realized that the metallic walls—conductors of heat unless properly insulated—afforded little protection in case of conflagration, and, accordingly, nonheating linings with fire-destroying characteristics were generally used in fabrication. It was old to make iron safes with inside linings spaced from the outer wall for use of a mixture of plaster of paris and water to deter the flames. In various instances chemically bound moisture was adopted, which, on becoming heated, turned into vapor or steam and thus aided in preventing the heat entering inside the safe. It was well known that crystallized moisture, in the absence of free moisture, prevented rusting of the metal and remained dormant until released by heat or fire.

The patent to Sherwood, No. 11,842, dated October, 1854, is claimed to cover a monolithic structure; the patent of Hyatt of 1870 is for improvement in heat-resisting materials for safes; and the Butler patent, No. 152,582, is for improvement in linings for safes. All indicated the use of chemically bound water contained in linings as a medium for wiping out fire in and about the safe. Sherwood melted and used pulverized clay in combination with heat alum, forming a mortar which he positioned between the outer and inner casing of the safe; but, since he did not use his composition for an outer dry lining, it was unable to impart desired stability to plaintiff's structure and achieve the result of the reissue patent. The dry clay was used by Sherwood as an outer lining, and the composition of clay and alum in its heated state for the inner filling, which, upon setting, became hard as stone, giving much weight to the safe —something the patentees avoided to attain greater efficiency. He does not suggest the idea of casting the insulating lining in a mold for fitting it to the outer steel shell, and drying it for keeping the combined moisture intact, and therefore is not anticipatory of patent No. 1,350,363 in issue as contended. Hyatt describes a filling of the space between the inner and outer walls of the safe of asbestos mixed with earth or chemical salts for securing crystallization of the water content, and he also mentioned compositions of plaster of paris, asbestos, and alum for this purpose. Butler in his patent refers to the various objections arising from dampness by use of dry clay and plaster of paris compositions, and generally dry substances with lumps of alum, and says that they absorb moisture from the

air, and in other ways the fireproof quality of the composition was impaired. His improved insulation was a solution of calcium chloride admixed with plaster of paris which he poured between the walls on the inner space and outside of the inclosure and allowed it to set. Although his solution somewhat retards fire heat, it nevertheless was subject to leakage from the poured plastic mass which dampened the contents of the safe. It was so testified by defendant's witness Herron and others, and reference to such defect as unsatisfactory is also made in the patent to Corliss. The Butler patent, 152,598, also strongly condemns the poured lining type of insulation, owing to leakage and corrosion. The various disadvantages emanating from the use of wet, poured compositions were successfully overcome by the precasting of the lining and drying method described in the reissue. None of defendant's prior citations disclose a precast monolith containing combined water without free water or excess free water to prevent rusting of the walls of the safe or dampening the contents. The Gilman patent, No. 332,246, has slabs for the inner lining immersed in shallow pans containing a strong solution of alum, or some other salt holding water in crystallization; but wet and dry linings are not shown, and therefore the citation requires no particular attention. The Booth patent No. 39,668, the Corliss patent, or the publication in Appleton's Encyclopedia, referring to the Butler and Marion fireproof safes, are not anticipatory. The Booth patent makes reference, it is true, to first precasting the lining and drying before putting it in the space between the outer and inner shells of the safes. It was technically a monolith structure, but, since the insulating material was of the kind that did not contain combined water, and, as Herron testified, was subject to shrinkage, it does not suggest the elimination of the problems and disadvantages with which the reissue patent was concerned. In the Corliss patent I find the insulating linings both for inner and outer walls were made in separate parts. The patent does not show either monolithic structure of the type described in the reissue, or means for drying the linings. The Encyclopedia publication mentioned refers to a dry plaster or cement and alum filling to prevent conduction of heat, but the article does not make clear whether the insulation was in a wet or dry condition when put in the spaces. The inference is not unwarranted that, since cement was in part used, the composition was poured, and accordingly essentially different from plaintiff's.

The point is made that the reissue cannot be construed to cover a monolith structure with insulating lining independent of other parts and independent of dry linings before envelopment by metal walls. It is argued that the original claim or claims of patent No. 1,342,204, covering the monolith structure broadly, were rejected by the Patent Office and subsequently abandoned, as was also the original claim relating to preliminary drying of excess moisture in the insulation. I find, however, that the original patent did not specify a process for making the safe, and that no claim covering a precast and dried lining was canceled; nor has the reissue any canceled claim. Plaintiff does not contend that its reissue patent is solely for a monolith structure, as distinguished from the specific method of making it. According to the description, the envelopment of the sheet metal walls over the dried casting and use of inner lining is optional. The casting itself is said to have a fine finish, and may be used as a safe without inner or outer metal, and various claims in issue (see, for example, 3, 9, and 10) are apparently directed to such a composite structure. Reference is also made to the chemically bound water until released by high temperature, and the exclusion of free water. A strict construction of claims 1 and 2 and claims specifying that the "said body," meaning bound water, "being practically devoid, through artificial elimination of free water" to absolute exclusion of all free moisture in the precast, is not required. The proofs conclusively show that a chemical body or lining of gypsum composition draws from the atmosphere a certain amount of moisture, depending as to quantity upon air conditions. Outwardly the hygroscopic form is dried. The presence of a small percentage of absorbed moisture physically bound is not considered to be free water. Indeed, it is evidenced that a small percentage of moisture aids in keeping the chemically bound water intact until released by heat agency. Claim 3, mentioning the removal of free water and leaving only the chemically bound water in the structure, was challenged by the Patent Office Examiners and the prior Arnold patent for monolith safes cited, embodying a claim for substantial elimination of free water. The inventors insisted that in their monolith structure all the free water is dissipated, leaving only the crystallized water, but practically conceded that their structure, after hardening, would still contain a certain amount of moisture. The Examiner, however, rejected claims 3 to 23, and subsequently, on appeal to the Board of Examiners in Chief, they were allowed for

a composite structure in monolith form from a plastic admixture and prior Arnold patent and others cited were distinguished. Arnold, I find, used a cement filler which dried with great difficulty. He did not precast or predry the lining for eliminating free water. His patent therefore was not anticipatory.

It is not deemed necessary to advert to additional citations. The prior art does not, I find, disclose or suggest the principle of the two patents in controversy. The 'combination claims of the reissued patent and earlier patent were broadly new, useful, and novel with relation to precasting the linings, and combining chemically bound with free water, and the extraction of the latter by the patentees' method of predrying.

 None disclose a wet and dry lining juxtaposed in the manner described in patent No. 1,350,363. The simplicity of the inventions and improvements over prior art safes received the approval of the skilled experts in the Patent Office, and the patents are entitled to presumption of validity. It makes no difference that the separate elements of the combinations were old, since !they were assembled in each patent in a new way to achieve a new and useful result. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527. The proven utility and value of the cabinet safes made under plaintiff's patents entitle the claims to an interpretation which will lead to affording the inventors a reasonable protection from infringing adaptations.

Defendant claims that its cabinet safes differ from the reissue, in that it does not cast its insulation lining independently of the steel walls; that defendant's safes are "dry safes" without independently cast insulation, using an old composition for the insulating linings, as specified in the Sherwood and Butler patents; that its insulations contain substantial amounts of free water besides the chemically combined moisture which produces new advantages: i. e., the vaporization of the free water as a safe protective element in case of fire, before the bound moisture is liberated to supply steam to the free moisture, and that its safes are also radically different from the cabinet safes of plaintiff manufactured under patent No. 1,350,363, and do not employ two layers of insulation—an inner wet and an outer relatively dry. I do not agree with the denial of infringements. The interrogatories (Exhibits 1A to 1B, and Exhibit 1B), together with defendant's exhibit catalog, indicate that defendant precasts in monolith form the insulating linings which are predried and do not normally discharge moisture. The mois-

ture is chemically combined, as in the reissue, for preventing leakage or evaporation, save only at high temperature. After being artificially dried, a lining is placed between the outer and inner steel walls of the safe, and means are provided at the back of the wall for letting the moisture escape in case of fire. Defendant utilizes a gypsum and water filler to shape its mold, puts a door jamb in the casting, making it integral with the monolith and embedded partly therein, and puts a reinforcing wire mesh in the cast between the inner and outer part. But this method was not a substantial departure, since these inclusions are believed to be a part of the monolith structure. The cast is molded independently of the steel walls of the finished safe, and has no free moisture other than normal absorption. Chemical analyses by witnesses Preston and Dr. Buckley showed the character of the composition and the combined water of defendant's structure to be negligible. And, in the opinion of the experts, composition linings from which less than 1 per cent. moisture is extractable are technically regarded as dry linings. Dr. Buckley found that defendant's composition contained 86 per cent. gypsum, 4.4 per cent. sawdust, and approximately 8 per cent. asbestos, which was the equivalent of plaintiff's gypsum composition and achieved substantially the same result. There was contradiction as to the percentage of free moisture content, but I am satisfied that the amount was small, and, moreover, that defendant's safe was devoid of moisture within the terms of the claims and functioned to prevent rusting of metal parts. Defendant's structure and process of making it are infringements of the reissue patent.

Referring again to the inner wetting insulation of patent No. 1,350,363, the specification says that it may consist of Kieselguhr or the like, immersed in any "salt of suitable character with a high content of water crystallization," and a dry insulation of asbestos, cork, and binders. In defendant's reply brief, it is again asserted that infringement is avoided because its insulating medium, both inner and outer, is wet, having water crystallization; that the outer insulation is composed of gypsum, asbestos, and cork, the inner of gypsum and lumps of alum, and the linings placed respectively as in the patent. But I do not think that either patent is limited to the use of a precise composition. As already pointed out, the description emphasizes compositions of matter having certain properties; i. e., a certain salt of a high content of water crystallization for the inner wetting insulation, while the dry insulation is

of low specific gravity and heat conductivity (thus distinguishing from cement), for protecting the inner wet insulation—the wetting insulation "serving, by development of steam under heat to protect the contents of the interior of the safe, and being itself protected against excessive strain by the dry insulation outside thereof." Defendant's adaptation of crystals-of alum and water crystallization for its inner lining does not avoid infringement. It is fairly evident that defendant has appropriated the essence of both inventions, and that the same result is attained by equivalent means or compositions for its predried linings, and slight alterations.

Plaintiff asks for a decree allowing treble damages. It asserts that the principle of both patents has been designedly and wantonly appropriated by defendant company, both as to process and product, with knowledge of the success attained by the inventions in suit and the recognition accorded plaintiff's safe structures by the Fire Underwriters' Associations, and after general acquiescence by the industry, and without any attempt on defendant's part to develop a noninfringing structure, as evidenced in part by advertising and cataloguing in simulation of plaintiff's publications. The case cited for allowance of treble damages (Auto Vacuum Freezer Co. v. William A. Sexton Co. (D. C.) 250 F. 459) was predicated upon false statements as to defendant's ownership of the basic patent covering the device. There is no suggestion of active misrepresentation in the instant case, or belittling of plaintiff's patents, which as to their validity were debatable. See Philadelphia Rubber Works Co. v. United States Rubber Co. (D. C.) 276 F. 600, at page 609. The cataloguing and advertising by defendant presumably were with plaintiff's knowledge; and, though this action was seasonably brought, yet, since the patents had not previously been litigated, I am disinclined to rule that plaintiff is entitled to recover treble damages.

Claims 1, 9, and 22 of the reissue were singled out as typical, and, though it was asserted that all the claims, except claim 15, were infringed, my examination of the record was restrictive, and I think adequate protection is afforded by limiting the decree to the claims considered. It is therefore decided that defendant's A and B types of safes are infringements of the aforesaid claims of the reissued patent, and that claims of patent No. 1,350,363 are infringed by defendant's manufacture and sale of the A type exhibit.

A decree with costs for the injunction and accounting may be entered. So ordered.